STATE OF IOWA, Appellee, v. J. L. NEVILLE, Appellant.

No. 44818.

OCTOBER 25, 1939.

Royal & Royal, and Xen Q. Lindel, for appellant.

Fred D. Everett, Attorney General, Jens Grothe, Assistant Attorney General, and Charles I. Joy, County Attorney, for appellee.

PER CURIAM.—Defendant was indicted for the crime of manslaughter, plead not guilty, was tried to a jury and con-

victed. Exceptions to instructions and motion for new trial were overruled, and sentence was pronounced. From said judgment and rulings defendant prosecuted this appeal which is presented upon a clerk's transcript of the record.

The manslaughter charge resulted from the death of the driver of an automobile in a collision with a car operated by appellant. One of the grounds of the motion for new trial was alleged misconduct of a trial juror of which appellant first learned after the trial. This juror resided in Perry, across the street from the home of the prosecutor county attorney, with whom she had been acquainted for many years. The trial was held at Adel, 20 miles from Perry, and was of 3 days duration. At the close of the first day the juror had no means of transportation to her home, and at her request the county attorney permitted her to ride with him in his automobile from Adel to Perry. At her request the juror rode with the county attorney from Perry to the courthouse in Adel the next morning, from Adel to Perry that evening, and from Perry to Adel the third morning of the trial. The foregoing appears from recitals in affidavits of the juror and the county attorney which also state that the transportation was only a neighborly act which did not inconvenience the county attorney and did not influence the juror nor affect her verdict. On behalf of appellant another affidavit recited that this juror had been overheard to say the county attorney had told her appellant was drunk at the time in question and that people had seen him drinking. This statement was denied by the juror and both the juror and county attorney denied any mention between them of any matter connected with the case.

The evidence relating to the alleged misconduct was presented to the trial court in the form of affidavits, certified copies of which are before this court in the clerk's transcript of the record.

Is must be assumed the trial court attached no credence to the allegation that the county attorney and juror had discussed the case or any phase of it. Undoubtedly the finding that there had been no mention of the case was based in part upon knowledge had by the court of the high character and integrity of the juror and county attorney and his observations during the proceedings. With that factful finding we

are in accord. The frank disclosures made in their affidavits indicate no consciousness on the part of either of any irregularity in their actions. We do not infer anything to the contrary.

■ Manifestly, this is not a case of intentional misconduct. It has to do with unconscious influence upon jurors as a result of favors from and social intercourse with parties, counsel and others connected with litigation. It has to do with the duty of the court to preserve the purity of the verdict, with public policy and with the effect of such irregularities upon the minds of litigants and the public at large. Lynch v. Kleindolph, 204 Iowa 762, 764, 216 N. W. 2, 3, 55 A. L. R. 745.

In that case a party to a civil action who had charge of the county home, at the request of a juror transported him to the home. It was then time for dinner which had already been prepared, and the juror was invited to and did eat with the family. In the case at bar the prosecuting attorney transported the juror between the two towns, not merely once, but repeatedly and upon each day of the trial. In Lynch v. Kleindolph, supra, Justice Albert, speaking for the court, said:

"The question involved herein is of a more serious character than would appear at first blush. There is probably no more interesting or fascinating question involved in the history of courts than the origin and development of the jury system. It is one of the most vital elements of our system of government. So far as the average citizen is concerned, he is less in touch with the executive and legislative departments. When he is confronted with private or public differences, he naturally turns to the courts for relief. His faith in the courts must be encouraged. When the time comes that our people lose faith in the courts, our form of government is fast nearing its end. It is meet and proper, therefore, that on questions of this kind the ruling should be such as to support the faith of litigants in our judicial system. That faith can only be sustained by keeping our judicial proceedings not only free from wrong, but free from all suspicion of wrong. In other words, all our court proceedings should be like Caesar's wife,—'above suspicion.'

"The question before us is not a question of whether any actual wrong resulted from the association of this defendant

332

with the juror, under the circumstances related, but whether it created a condition from which the opposing litigants and the general public might suspect that wrong resulted from this association. It is not a question of whether both the defendant and the juror were high-class citizens, and would not be guilty of discussing this lawsuit on this trip, but rather a question of whether or not this conduct should be countenanced by the court. * * * we feel that this question is so vital and so far-reaching in its effect that we ought to place our stamp of disapproval thereon, to the end that, for the benefit of litigants at least, a jury's verdict should be above suspicion.''

The foregoing principles accord with the recent trend of authority. 13 Iowa Law Review 360. The reasons for these principles are no less salutary in cases involving human liberty than in civil trials. A well considered case which cites holdings from various jurisdictions is La Valley v. State, 188 Wis. 68, 205 N. W. 412, followed in Shefelker v. First National Bank of Marion, 212 Wis. 659, 250 N. W. 870, and in Village of Bangor v. Hussa C. & P. Co., 208 Wis. 191, 242 N. W. 565, both of which refer to factual situations similar to those at bar. See also State v. Ferguson, 48 S. D. 346, 204 N. W. 652; State v. Hanks, 55 S. D. 63, 224 N. W. 946.

Therefore, we hold the record necessitates granting appellant a new trial. A reversal follows.—Reversed.